FILED

APR 1 8 2007

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ]  Case No. 06-50708-ASW |
| | ] |
| Cathie M. Swan | ]  Chapter 13 |
| | ] |
| Debtor. | ] |

MEMORANDUM DECISION
ON CREDITOR'S AMENDED OBJECTION TO CONFIRMATION

Before the Court is the amended objection of American Express Centurion Bank ("Creditor") to confirmation of the amended chapter 13 plan of Cathie M. Swan ("Debtor"). Creditor's objection is based on the assertion that (1) Debtor has not pledged all of her projected disposable income in support of the amended plan; (2) that Debtor (A) improperly claimed a transportation ownership expense based on the IRS Local Standard Transportation Expense Standards on Form B22C for a vehicle she owns free and clear of any liens and (B) improperly claimed a housing expense based on the IRS Local Standards for a one member household in Santa Clara County, California, although such expense exceeds Debtor's actual housing expense; and (3) that the phrase "applicable commitment period"

referenced in 11 U.S.C. § 1325(b)(4)[1] requires the amended plan to have a term of sixty months.

The Chapter 13 Trustee in this case is Devin Derham-Burk ("Trustee"). Richard T. Hilovsky, Esq. of the Law Offices of Richard T. Hilovsky, represents Debtor. John M. O'Donnell, Esq. of the Law Offices of John M. O'Donnell, represents Creditor.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

FACTS

The facts of this case are undisputed.

Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code on May 1, 2006. Concurrently with the filing of the petition, Debtor submitted a proposed chapter 13 plan, Statement of Financial Affairs, and Form B22C "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" ("Form B22C"). On June 1, 2006, Creditor filed an "Objection to Confirmation of Debtor's Plan". Debtor filed an amended plan on July 10, 2006 ("Plan"), and Creditor filed an amended objection on August 24, 2006 ("Objection"). The Trustee filed a Brief in Support of Confirmation of Debtor's Proposed Plan on December 15, 2006.

Debtor lives in San Jose, California. Debtor's Schedule J shows a monthly rental expense of $800. On Schedule B, Debtor

---

[1] Unless otherwise noted, all statutory references are to Title 11, United States Code (the Bankruptcy Code), as it existed when Debtor filed the bankruptcy petition on May 1, 2006.

lists a single automobile: a 1988 Ford Tempo with 120,000 miles. Debtor owns the Ford Tempo free and clear of any liens.

On Schedule I, Debtor lists gross monthly wages of $4,462 and net monthly income (after deductions for taxes, insurance, and union fees) of $2,958. Debtor's total monthly expenses on Schedule J are $2,433, leaving monthly net income, according to the schedules, of $525.

On Form B22C, Debtor checked the box at the top of the first page indicating that "Disposable income is determined under § 1325(b)(3)", and the "applicable commitment period is 5 years." Debtor's current monthly income from Form B22C, line 11, is $4,965.04. Annualizing her current monthly income from Form B22C totals $59,580.48, which exceeds California's median family income of $43,107 for a family with one earner. Accordingly, Debtor is an above-median debtor and must complete the expense portion of Form B22C to determine the amount of disposable income that must be paid into her plan pursuant to 11 U.S.C. § 1325(b)(3).

On Line 25B of Form B22C, Debtor deducted $1,644 for housing using the IRS Local Standard for a one-member household in Santa Clara County, California. In addition, on Line 28 of Form B22C, Debtor deducted $471 for the Local Standard amount allowed for vehicle ownership expense. Debtor's total expenses allowed under the IRS Standards at line 38 of Form B22C are $4,905.54. As a result, Debtor's monthly disposable income according to Form B22C is $59.50.[2]

The Plan proposes payments of $525 per month for 36 months, resulting in total Plan receipts of $18,900.00. The proposed

---

[2] $4,965.04 - $4,905.54 = $59.50.

dividend to Debtor's unsecured non-priority creditors is approximately 17%.

Creditor holds two unsecured non-priority claims for unpaid credit card debt totaling $29,468.85.[3] These claims represent approximately 34% of the total claims against Debtor.[4]

Creditor's Objection contends that: (A) Debtor is not allowed to take the standard IRS expense deduction (IRS Local Standard for housing) when her actual rent is less than the standard; and (B) Debtor is not allowed to take an ownership deduction specified in the IRS Local Transportation Expense standards because she owns a car free and clear of liens. If Creditor is correct, and Debtor's claimed expense deductions are disallowed, then Debtor's monthly disposable income according to Form B22C would rise by $1,315.[5] In that case, Debtor's Amended Plan could not be confirmed because Debtor would not be paying all of her "projected disposable income" to unsecured creditors, and thus the Plan would violate § 1325(b)(1)(B). Debtor counters that the expense deductions are proper, and therefore the Plan satisfies the requirement that all projected disposable income be pledged to pay unsecured creditors. Finally, Creditor contends that because Debtor is an above-median debtor her "applicable commitment period" under § 1325(b)(1)(B) is sixty months, and this requires Debtor to commit to a five-year

---

[3] According to Schedule F, Creditor holds two unsecured claims against the Debtor, one for $17,734.74 and another for $11,734.11, each arising from a separate credit card account.

[4] According to Schedule F, Debtor has total nonpriority general unsecured debt of $87,235.

[5] $471 vehicle ownership expense plus $844 (difference between standard housing deduction of $1644 and Debtor's actual housing expense of $800).

plan.    Debtor responds by arguing that Creditor misunderstands the BAPCPA requirements and that her Plan satisfies the statute because she is paying significantly more than the full amount she would be required to pay over a five-year plan during the three-year term of her proposed Plan.  In fact, Debtor is proposing to pay five times more under the proposed three-year Plan than she would be required to pay over five years.

II.

ANALYSIS

The petition was filed on May, 1, 2006, and thus all statutory amendments contained in the BAPCPA apply in this case.

**1. Whether calculation of Debtor's projected disposable income under § 1325(b)(1) requires the Court to look beyond Form B22C.**

Pursuant to § 1325(b)(1)(B), the Plan must provide "that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan."  11 U.S.C. § 1325(b)(1)(B). Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor...less amounts reasonably necessary to be expended...for the maintenance and support of the debtor or a dependent of the debtor..." 11 U.S.C. § 1325(b)(2).

Creditor's argument in this regard is not clear. Creditor states that Debtor's Plan should not be confirmed because the debtor is not paying all of her "projected disposable income" under 11 U.S.C. § 1325(b)(1)(B).  Creditor cites cases supporting the proposition that "projected disposable income" may be different

than "disposable income." <u>In re Hardacre</u>, 338 B.R. 718, 723 (Bankr. N.D. Tex. 2006); <u>In re Kibbe</u>, 342 B.R. 411, 414-15 (Bankr. D. N.H. 2006); <u>In re Dew</u>, 344 B.R. 655, 660 (Bankr. N.D. Ala. 2006). Creditor fails, however, to provide this Court with any alternative basis for calculating Debtor's projected disposable income. Creditor has not alleged any facts indicating that Debtor has the ability to pay more, or is likely to receive a substantial increase in income in the near future. Rather, in this case, Debtor's gross monthly income stated on Schedule I ($4,642) is less than on her statement of CMI ($4,965.04). Accordingly, Creditor's only allegations regarding Debtor's alleged failure to pledge all of her projected disposable income to payment of unsecured creditors relate to the housing and vehicle ownership expense deductions. Creditor makes no other argument that the statement of net income on Form B22C does not accurately reflect the income to be received by Debtor in the future. Therefore, the cases cited by Creditor are inapposite. The only specific objections by Creditor involve the expense deductions, which the Court, for the reasons stated <u>infra</u>, overrules in this Memorandum Decision.[6]

---

[6] Moreover, in its Objection, Creditor adopts Debtor's net income statement from Form B22C as the starting point for its calculations of projected disposable income. Nowhere does Creditor argue that the Court should look elsewhere (like, for example, to Schedules I & J) to determine Debtor's required monthly Plan payment.

Because Creditor has not made any other specific objection to the calculation of Debtor's projected disposable income, the Court need not decide the issue of whether a departure from Form B22C is permissible under the law or warranted on the facts of this case. Courts deciding this issue have taken at least three different approaches. <u>See</u> <u>In re Miller</u>, --- B.R. ----, 2007 WL 60812 (Bankr. N.D. Ala. Jan. 18, 2007)(holding that Form B22C is dispositive of an above-median debtor's projected disposable income); <u>In re Jass</u>, 340 B.R. 411 (Bankr. D. Utah 2006)(holding that Form B22C is not dispositive of a debtor's projected disposable income, but will

**2. Whether the expense deductions claimed by Debtor on Form B22C are proper.**

Where the holder of an allowed unsecured claim objects to confirmation, a plan must pledge all projected disposable income during the "applicable commitment period." 11 U.S.C. § 1325(b)(1)(B). Disposable income is defined as current monthly income less "amounts reasonably necessary to be expended." In re Crews, 2007 WL 626041, *3 (Bankr. N.D. Ohio Feb. 23, 2007). Debtor is an above-median income debtor, and therefore, according to § 1325(b)(3), the amounts reasonably necessary to be expended in calculating Debtor's disposable income under 1325(b)(2) "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." In re Naslund, --- B.R. ----, 2006 WL 4038608, *8 (Bankr. D. Mont. Nov. 16, 2006). Section 707(b)(2)(A)(ii)(I) states, in pertinent part:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent.

Creditor's Objection regarding Debtor's alleged failure to pledge all projected disposable income to repayment of unsecured creditors is based on two separate arguments. The first is Creditor's contention that Debtor is not entitled to take the IRS standard vehicle ownership deduction because Debtor owns her

---

receive a presumption that it reflects projected disposable income absent a showing of a substantial change in circumstances); In re Demonica, 345 B.R. 895, 900 (Bankr. N.D. Ill. 2006)(holding that the term "projected disposable income" "must mean something other than the income computed on Form B22C.")

1  vehicle free and clear of liens.  Creditor's second argument is

2  that, because Debtor's actual housing expense is less than the IRS

3  local standard allowance, Debtor is only entitled to deduct her

4  actual housing expense.  Although these are presented as separate

5  arguments, they both turn on the same issue, and that is whether

6  the IRS Local Standards are caps on the allowable deductions, or

7  are the fixed allowances that all above-median debtors may take

8  when completing Form B22C.  See <u>Crews</u>, 2007 WL 626041 at *3.  For

9  the reasons that follow, the Court finds that, with respect to both

10  issues, the IRS Local Standards are not caps, but provide the

11  actual deductions to be taken under the circumstances.

12  Accordingly, the Court finds that Debtor's Plan does pledge all

13  projected disposable income to payment of unsecured creditors, and

14  Creditor's Objections on that basis are therefore overruled.

15  **A.  Whether, on Form B22C, Debtor may deduct the vehicle**

16  **ownership expense for a car owned free and clear of liens.**

17  Debtor owns her vehicle free and clear of liens.  Debtor

18  claimed a deduction for transportation ownership/lease expense of

19  $471 on Form B22C.  There is no question that this is the relevant

20  amount of the IRS Transportation Standards, Ownership Costs

21  deduction for a first car.  The question is whether it is

22  appropriate for Debtor, who owns her vehicle outright, and

23  therefore currently makes no lease or finance payments on the

24  vehicle, to take this deduction.

25  This issue has been thoroughly discussed in recent cases.  No

26  discernable majority view has yet emerged.  This Court counts

27  eleven opinions holding that a debtor cannot deduct an ownership

28  expense for a vehicle owned free and clear.  <u>Hardacre</u>; <u>In re</u>

McGuire, 342 B.R. 608 (Bankr. W.D. Mo. 2006); In re Barraza, 346 B.R. 724 (Bankr. N.D. Tex. 2006); In re Lara, 347 B.R. 198 (Bankr. N.D. Tex. 2006); In re Carlin, 348 B.R. 795, (Bankr. D. Or. 2006); In re Oliver, 350 B.R. 294 (Bankr. W.D. Tex. 2006); In re Harris, 353 B.R. 304 (Bankr. E.D. Okla. 2006); In re Wiggs, 2006 WL 2246432 (Bankr. N.D. Ill. August 4, 2006); In re Devilliers, --- B.R. ----, 2007 WL 92504 (Bankr. E.D. La. Jan. 9, 2007); In re Slusher, --- B.R. ----, 2007 WL 118009 (Bankr. D. Nev. Jan. 17, 2007); In re Ceasar, --- B.R. ----, 2007 WL 777821 (Bankr. W.D. La. Mar. 6, 2007). Fourteen courts have gone the other way, holding that the debtor may deduct the ownership expense for a vehicle that is not financed or leased. In re Demonica, 345 B.R. 895 (Bankr. N.D. Ill. 2006); In re Fowler, 349 B.R. 414 (Bankr. D. Del. 2006); In re Hartwick, 352 B.R. 867 (Bankr. D. Minn. 2006); In re Grunert, 353 B.R. 591 (Bankr. E.D. Wis. 2006); In re Haley, 354 B.R. 340 (Bankr. D. N.H. 2006); In re Wilson, 356 B.R. 114 (Bankr. D. Del. 2006); In re McIvor, 2006 WL 3949172 (Bankr. E.D. Mich. Nov. 15, 2006); Naslund; In re Prince, 2006 WL 3501281 (Bankr. M.D.N.C. Nov. 30, 2006); In re Zak, --- B.R. ----, 2007 WL 143065 (Bankr. N.D. Ohio Jan 12, 2007); In re Sawdy, --- B.R. ----, 2007 WL 582535 (Bankr. E.D. Wis. Feb. 20, 2007); Crews; In re Enright, 2007 WL 748432 (Bankr. M.D.N.C. Mar. 6, 2007); In re Watson, --- B.R. ----, 2007 WL 1086582 (Bankr. D. Md. Apr. 11, 2007).

This Court finds the latter line of cases more persuasive. The bankruptcy court in Sawdy collected the cases and analyzed the different rationales expressed by courts on both sides of this issue, setting forth six separate categories of explanations offered by the courts: (1) the "Plain Meaning" Rationale; (2) the

Unfair Results Rationale; (3) the "Ownership/Liability" Distinction Rationale; (4) the Policy Rationale; (5) the Applicable vs. Actual Rationale; and (6) the Reliance on IRS Materials Rationale. Sawdy, --- B.R. at ----, 2007 WL 582535 at *4 - *13. Like the Sawdy court, this Court finds two of those rationales particularly convincing -- what the Sawdy court termed (1) the Applicable vs. Actual Rationale; and (2) the Reliance on IRS Materials Rationale. Both are applicable not only to this issue, but to the housing deduction issue as well. In addition to the two rationales that convinced the Sawdy court, this Court also finds that a separate policy rationale supports allowing the deduction. This policy rationale was touched upon, but not fully explicated, by the Sawdy court in its discussion of what it termed the "Unfair Results Rationale." Sawdy, --- B.R. at ----, 2007 WL 582535 at *6. In addition to the rationales explored, in whole or in part, by the Sawdy court, this Court finds that a separate efficiency argument, buttressed by BAPCPA's legislative history, supports allowance of the standard deductions.

### The Applicable vs. Actual Rationale

This rationale arises from an examination of the language of § 707(b)(2)(a)(ii)(I). The first clause of that section states that, "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards." The clause immediately thereafter states: "and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides...." The distinction made by the bankruptcy court in

1  <u>Fowler</u>, and which this Court finds highly persuasive, is that the

2  use of the word "applicable" in the first clause with regard to

3  some expenses (which include both housing and transportation

4  ownership), and the use of the word "actual" with regard to "Other

5  Necessary Expenses", indicates Congressional intent to distinguish

6  between the two classes of expenses, and to allow debtors to use

7  the deductions found in the Local Standards for the first category.

8  A debtor's actual expenses are only relevant with respect to

9  expenses that fall into the "Other Necessary Expenses" category.

10 <u>Fowler</u>, 349 B.R. at 418.  Applied specifically to the

11 transportation ownership expense, which clearly falls within the

12 first clause of § 707(b)(2)(a)(ii)(I) and is set forth in the Local

13 Standards, this interpretation leads to the conclusion that any

14 debtor who owns a vehicle is entitled to the deduction for

15 transportation ownership, regardless of whether or not the debtor,

16 at the moment of plan confirmation, has an actual car payment

17 expense.

18    This conclusion is consistent with an interpretation of the

19 Local Standards, incorporated into § 707(b)(2)(a)(ii)(I), as fixed

20 allowances, rather than caps on actual expenses.  <u>See</u> <u>Crews</u>, 2007

21 WL 626041 at *3 - *4.  That this was the intent of Congress in

22 enacting this bankruptcy legislation is further supported by the

23 fact that, under the Internal Revenue Manual ("IRM"), the

24 transportation ownership standards act as caps: "Taxpayers will be

25 allowed the local standard or the amount actually paid, whichever

26 is less."  IRM 5.8.5.5.2.  The fact that, in enacting the current

27 version of the bankruptcy code, Congress chose not to adopt the

28 language from the IRM "evidences that it did not intend the Local

Standards to apply as a cap." <u>Fowler</u>, 349 B.R. at 418.

**The Reliance on IRS Materials Rationale**

As explained in <u>Sawdy</u>, --- B.R. at ----, 2007 WL 582535 at *13 - *14, many of the courts finding that a debtor who owned a vehicle free and clear of liens could not take the ownership deduction relied, to some extent, on language in the IRM and the IRS Collection Financial Standards. <u>See</u> <u>Hardacre</u>, 338 B.R. at 726; <u>McGuire</u>, 342 B.R. at 612-13; <u>Barraza</u>, 346 B.R. at 728; <u>Carlin</u>, 348 B.R. at 797; <u>Hartwick</u>, 352 B.R. at 869. In so doing, these courts concluded, on the basis of the language of those IRS publications, that because the IRS is clear that when considering allowances for housing and transportation, a taxpayer may take the lower of the deduction set forth in the Local Standards or the amount actually spent, the same was true in this context. Accordingly, those courts held that the debtor was only entitled to deduct the lesser of the Local Standard deduction and the actual expense -- so where the debtor had no transportation ownership expense (because the vehicle was owned free and clear), the debtor was not entitled to any deduction.

As discussed in the preceding section, the bankruptcy courts in <u>Fowler</u> and <u>Grunert</u> pointed out the flaw in this reasoning by referencing BAPCPA's legislative history. <u>See</u> <u>Fowler</u>, 349 B.R. at 419; <u>Grunert</u>, 353 B.R. at 594. If Congress had intended to adopt wholesale the language and intent of these IRS publications, it could have done so explicitly. Congress did not. In fact, § 707(b)(2)(a)(ii)(I) refers specifically to the National Standards and Local Standards, but "does not refer to or purport to include the numerous rules and practices specified throughout the Internal

Revenue Manual." <u>Prince</u>, 2006 WL 3501281 at *2. None of the courts using the IRS publications in reaching their decisions cited any specific authority for doing so[7], but simply found it "instructive" to do so. <u>Hardacre</u>, 338 B.R. at 726. In the absence of any specific authority directing courts to apply those publications in interpreting this Code section, reference to such materials is inappropriate.

**The Unfair Results Rationale**

For the sake of consistency with the discussion in prior opinions, the Court will refer to this as the Unfair Results Rationale. The debtors in <u>Sawdy</u> argued that in most cases where debtors owned the vehicle for a long time, the vehicle had once been subject to a lien, but the lien had been paid off. Accordingly, in such cases, the debtors will own older vehicles, which are more likely to require repairs or replacement during the life of a typical chapter 13 plan. The debtors in <u>Sawdy</u> argued that it would be unfair to force them to pay the amount of the monthly ownership expense to creditors when they may, and likely will, need that amount of money in the future to repair or replace their present vehicle. <u>Sawdy</u>, --- B.R. at ----, 2007 WL 582535 at *7. The <u>Sawdy</u> court ultimately found this rationale unpersuasive, interpreting it as a general argument for building an "emergency cushion" into the disposable income requirement of § 1325(b)(1)(A), for which the court found no statutory support, and which the <u>Sawdy</u>

---

[7] Other than the assertion that statutory interpretation is "a holistic endeavor," citing <u>United Sav. Ass'n v. Timbers of Inwood Forest Assoc., Ltd.</u>, 484 U.S. 365, 371 (1988). <u>Hardacre</u>, 338 B.R. at 725.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

court was "reluctant" to read into the Code. <u>Sawdy</u>, --- B.R. at --
--, 2007 WL 582535 at *9.

This Court respectfully disagrees with this portion of the
<u>Sawdy</u> court's analysis. In this Court's opinion, the argument that
a debtor who owns an old car free and clear of liens almost
inevitably will have to repair or replace it during the chapter 13
plan term provides strong support for allowing the standard
deduction, both on the basis of the specific facts in this case,
and the policy in general. Here, Debtor owns a 1988 Ford Tempo
with 120,000 miles. By any reasonable assessment, there is a
strong probability that the Debtor will have to obtain a
replacement vehicle during the term of the Plan. The vehicle has
very little value (Debtor valued the car at $1,500 on Schedule B),
which likely renders any major repair an economically inefficient
venture. Any type of reasonably reliable replacement will cost the
Debtor several thousand dollars up front, a lengthy commitment on a
significant monthly payment for a loan or lease, or both (in the
case of a new car with money down -- which may be necessary to make
the monthly payments manageable for those with meager incomes
and/or tight budgets). Requiring the Debtor to pay the full amount
of the monthly ownership expense by disallowing the deduction would
effectively foreclose the Debtor from doing any of those things --
and ultimately from being able to replace the vehicle at all. If
forced to pay the full amount of the vehicle ownership expense to
creditors, the Debtor would not be able to amass any savings to use
if the car breaks down, and would not have any monthly cash flow
available to make monthly payments on a loan or lease. The Debtor
could be forced to choose between making Plan payments and buying

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

or leasing a new vehicle, and could ultimately wind up defaulting
on the Plan as a result. This Court finds that such a result would
be inconsistent with the fresh start policy of the Code and unfair
to the Debtor. Moreover, if Debtor cannot complete her Plan, she
would likely convert to chapter 7, which would result in creditors
receiving less money than they would under the Plan.

### The Efficiency Rationale

Creditor responds to the Unfair Results Rationale by arguing
that the Debtor could seek to modify the Plan if in fact the car
does break down. The Court finds this argument unpersuasive.
Considering the strong likelihood that Debtor will have to replace
her 1988 Ford Tempo during the term of the Plan, requiring that the
Plan be modified if and when that occurs is, in this Court's
opinion, an inefficient manner of dealing with this issue. Every
modification would require the Debtor to contact her attorney, have
her attorney draft and file the necessary papers and serve notice
on creditors. If a creditor should object, a hearing would have to
be held, Debtor's counsel would have to file additional papers and
appear at the hearing, and the Court would have to decide the
motion. That process takes a significant amount of time, and costs
a significant amount of money, in terms of attorney's fees,
noticing costs, and judicial resources. All of that simply to
allow Debtor to pay for a vehicle -- which is, in most cases, an
absolute necessity in terms of allowing a debtor to maintain
employment. Going through such a procedure under these
circumstances in thousands of bankruptcy cases is not what Congress
intended. Allowing the standardized deduction, as the BAPCPA
provides, is far more efficient.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

This is consistent with BAPCPA's intent to limit the bankruptcy court's discretion in inquiring into "'lifestyle and [disposable income] philosophy' questions that were prevalent under prior law. Instead, the court is left to review the Form B22C, which properly permits certain deductions that are greater than the debtor's actual expenses." Grunert, 353 B.R. at 594 (citations omitted). The legislative history of BAPCPA supports the conclusion that the IRS standards, rather than the debtor's actual expenses, are to be used on Form B22C: "The bill also makes substantial changes to chapter 13 by substituting the IRS expense standards to calculate disposable income....The formula remains inflexible and divorced from the debtor's actual circumstances." Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R.Rep. No. 109-31, pt. 1 at 553 (2005). Treating the standard deductions as fixed allowances, rather than caps on actual expenses, furthers the interests of efficiency, ease of administration, and limits the bankruptcy courts' inquiry into debtors' individual expenditure choices, as intended by Congress.

From a policy perspective, Creditor's position would have the perverse effect of incentivizing debtors to incur large vehicle loans on the eve of filing chapter 13 and to spend the full amount of the standard vehicle ownership deduction. If a debtor who owns a vehicle free and clear is not permitted to take the ownership deduction, then debtors have every motivation to buy a new car -- immediately prior to filing for bankruptcy -- for which the deduction is permitted. Debtors who do so would receive the benefit of possessing a newer vehicle, rather than the old one owned free and clear. Faced with the choice of owning a new car or

driving an old car and paying their unsecured creditors a few
hundred additional dollars every month, while at the same time
being tethered to a plan that makes no allowance for car payments,
any rational debtor would choose the former.  It is better policy
to promote the purchase and use of lower-cost used vehicles by
debtors.  This is a more financially responsible choice than a
policy that encourages debtors to stretch their budgets to buy more
expensive new vehicles -- just before filing bankruptcy --  to take
advantage of a deduction, where the only other practical
alternative is, from the debtors' perspective, to lose the ability
to fix or replace their vehicles.

**B.  Whether, on Form B22C, Debtor may deduct the housing
allowance provided by the IRS standards, or is limited to the
actual expense.**

Debtor's actual monthly rent payment is $800.  Debtor claimed
a deduction of $1,644 on Form B22C.  This is the appropriate IRS
Housing and Utility Local Standard for a one-member household in
Santa Clara County, California.  The question for decision is
whether a debtor whose actual housing expense is lower than the IRS
standard may nevertheless deduct the standard amount.

There are three decisions on this issue of which this Court is
aware.  Two hold that the debtor is entitled to take the full
amount of the applicable housing deduction without consideration of
the debtor's actual expense.  In re Ferrar-Johnson, 353 B.R. 224
(Bankr. N.D. Ill. 2006); In re Naslund, --- B.R. ----, 2006 WL
4038608 (Bankr. D. Mont. Nov. 16, 2006).  The other holds that a
debtor is only entitled to claim the lesser of the IRS local
standard amount or the actual housing expense.  In re Rezentes, ---

B.R. ----, 2007 WL 988055 (Bankr. D. Haw. Apr. 2, 2007). This Court agrees with the Ferrar-Johnson and Naslund decisions. The reasoning that this Court finds persuasive in reaching this conclusion is the same as that employed by numerous courts in deciding the vehicle ownership expense deduction. The Unfair Results Rationale, as it applies in this context, has not received any attention in the cases, and is worthy of further discussion.

If the Court were to accept Creditor's position and cap Debtor's housing deduction on Form B22C at her actual expense, it would have the effect of locking Debtor in to that expense for the duration of the chapter 13 Plan. Such a result would be unfair to the Debtor because it is highly unlikely that Debtor's housing expense will remain at the current level throughout the Plan term. Circumstances inevitably change. Rents generally go up. People move. If Debtor's rent were to increase by ten percent, that would amount to $80. But under Creditor's position, Debtor would be unable to find money in her budget to pay for that increase, because it would already have been pledged toward payment of unsecured creditors. That potentially would result in Debtor defaulting in her Plan payments (because she would be forced to divert funds allocated to the Plan toward staying current on her rent) or, worse yet, being evicted from her home. If Debtor is unable to make her Plan payments, the case likely would be converted to chapter 7, and creditors would receive a lower return than they are entitled to under the Plan. None of these events are in the best interest of Debtor or the unsecured creditors.

As in the context of the car ownership expense, the response that Debtor could modify the Plan if her rent increases is

unconvincing. It is possible, perhaps likely, that Debtor's rent could increase every year. Such a situation would require numerous modifications over the life of the Plan. Requiring Debtor to move to modify the Plan at every occasion of an increase in rent is inconsistent with the BAPCPA, and is terribly inefficient. Requiring the Debtor to incur hundreds of dollars of attorney's fees every time her rent goes up, for the sole purpose of allowing her to budget properly for her housing expense, cannot have been the result intended by Congress. The standardized deduction provided for in the language of the BAPCPA, as described above, is far more efficient.

As with the vehicle ownership situation, the same perverse policy implications are at play here. Acceptance of Creditor's position creates an incentive for debtors to spend the full amount of the allowable housing deduction on their housing expense. In this particular case, that amounts to more than $800 per month. Any rational person faced with the choice of living in a house that costs $1,600 per month, or one that costs $800 per month and at the same time being tethered to a plan that makes no allowance for rent increases, would likely choose the former. For the courts to promote such a choice would be irresponsible. Debtors should be given incentives to live within their means and to choose lower cost alternatives when fulfilling everyday needs such as housing and transportation. Such a policy is in the best interests of debtors and creditors, both in the long-run and in the short term. Debtors who live more frugally are less likely to default on their plans, and thus creditors will receive a greater return in the short term. In the long-run, Debtors who develop financially sound

decision-making skills are more likely to repay their debts than those who live on the edge of, or beyond, their means.[8]  This approach is consistent with both the language and the intent of the BAPCPA, as explained _supra_, in connection with the discussion of the vehicle ownership deduction.

**3. Whether the term "applicable commitment period" in 1325(b) requires Debtor to commit to a sixty-month plan.**

Section 1325(b)(1)(B) states that a court may not confirm a

---

[8] The recent decision of the bankruptcy court in _Rezentes_, despite its holding in favor of Creditor's position, illustrates the inefficiency of such a holding, as well as the perversity of the policy it encourages.  In _Rezentes_, above-median debtors (a bus driver and school teacher with four dependent children) lived in a series of rented homes.  The first cost $2,100 per month, and the second $1,800 per month.  When the debtors' finances got even tighter, they moved in with the debtor-husband's parents (nine people to a three-bedroom house), where they paid only $300 per month in rent.  After filing a chapter 13 petition, the debtors attempted to take the IRS local standard housing deduction for a family of six of $2,000 on Form B22C.  An unsecured creditor objected to the deduction, arguing that the debtors were only entitled to deduct the lesser of the standard deduction or their actual housing expense.  The bankruptcy court adopted the creditor's position, holding that the debtors were only entitled to deduct their actual housing expense of $300.  Following its holding, the _Rezentes_ court included a section in its discussion entitled "Possible Solutions for the Debtors' Dilemma," wherein it acknowledged: "The irony of this case is that the debtors must make larger plan payments because they moved into a too-small home in a valiant and commendable effort to pay their creditors.  If the debtors had remained in one of their prior residences, rather than reduced their housing expense in a failed attempt to keep up with their bills, the debtors could have claimed the entire local standard expense."  The court then suggested that the debtors could propose a plan initially based on their actual housing expense, and then propose a modification if they moved into more expensive housing that better suits their needs.  Or, the court suggested, the debtors could propose a plan with variable payments that would allow them to save up for a move into more appropriate (and expensive) housing.  As discussed _supra_, requiring honest debtors to navigate chapter 13 in such a manner, and to incur the additional expenses, so as to enable them to budget for appropriate housing is, _inter alia_, inefficient, unfair, contrary to the language and intent of BAPCPA, and constitutes bad policy.

Case: 06-30708   Doc# 39   Filed: 04/18/07   Entered: 04/18/07 15:23:50   Page 20 of 30
MEMORANDUM DECISION

plan unless it "provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan."  11 U.S.C. § 1325(b)(1)(B).  According to the Code, the "applicable commitment period" that applies to Debtor is "not less than 5 years."  11 U.S.C. § 1325(b)(4)(A)(ii).  Creditor contends that Debtor's Plan may only be shorter than 5 years if Debtor pays all allowed unsecured creditors in full, pursuant to § 1325(b)(4)(B).  It is undisputed that the Plan does not provide for full payment of all allowed unsecured claims.  Debtor argues that the statute does not require a fixed plan term, and that, because the Plan proposes to pay, over 36 months, an amount greater than Debtor's projected disposable income multiplied by 60 months, the Plan should be confirmed as proposed.

This issue has been described as a distinction between a "monetary" requirement and a "temporal" requirement.  In re Brady, --- B.R. ----, 2007 WL 549359, *9 (Bankr. D. N.J. Feb. 13, 2007), citing Alane A. Becket and Thomas A. Lee, III, Applicable Commitment Period: Time or Money?, 25-MAR Am. Bankr. Inst. J. 16 (2006).  Creditor espouses the view that the phrase "applicable commitment period" imposes a temporal requirement that Debtor must commit to a plan for a specific amount of time -- in this case, five years.  Some courts have adopted this position.  Slusher, --- B.R at ----, 2007 WL 118009 at *11; In re Casey, 356 B.R. 519, 527 (Bankr. E.D. Wash. 2006); In re Cushman, 350 B.R. 207, 212 (Bankr. D. S.C. 2006); In re Davis, 348 B.R. 449, 458 (Bankr. E.D. Mich. 2006); Dew, 344 B.R. at 661; McGuire, 342 B.R. at 615.

1     Debtor takes the position that "applicable commitment period"

2 constitutes a monetary requirement such that, in order to be

3 confirmed, Debtor's three-year Plan must provide for payment of her

4 projected disposable income multiplied by the applicable commitment

5 period. In this case, the relevant calculation is $59.50 projected

6 disposable income according to Form B22C multiplied by the 60 month

7 applicable commitment period equals $3,570. Debtor argues that the

8 Plan satisfies the requirements of the Code, and therefore may be

9 confirmed, because it proposes to pay $18,900 over 36 months, which

10 is over five times more than Debtor's projected disposable income

11 over the applicable commitment period of $3,570. Cases supporting

12 Debtor's position include Brady, and In re Fuger, 347 B.R. 94

13 (Bankr. D. Utah 2006). Bankruptcy Judge Keith M. Lundin takes the

14 same view in his chapter 13 treatise. See 5 Keith M. Lundin,

15 Chapter 13 Bankruptcy §§ 500.1 at 500-2 (3d ed. 2006)("The

16 applicable commitment period does not require that the debtor

17 actually make payments for any particular period of time. Rather

18 it is the multiplier in a formula that determines the amount of

19 disposable income that must be paid to unsecured creditors.")

20     The logic of Debtor's position is straightforward. Unsecured

21 creditors will receive more under the Plan than is required by the

22 Code. Specifically, in this case, unsecured creditors will receive

23 more than five times what the Code requires ($18,900 compared with

24 $3,570), and they will receive it more quickly under Debtor's

25 three-year Plan than they would if the Court were to adopt

26 Creditor's position, and require a five-year plan term. This is

27 clearly to the benefit of all creditors. The unsecured creditors

28 are not being paid interest, so the time value of money makes the

disparity between what Debtor is offering to pay under the Plan --
$18,900 over three years -- and what unsecured creditors would be
entitled to under Creditor's position -- $3,570 over five years --
even greater than it appears at first blush. Debtor's position
also furthers the Code's fresh start policy, allowing Debtor to
fulfill the obligations imposed by the Code in a shorter amount of
time, receive a discharge, and move on.

In light of the extreme monetary disparity between the two
positions, it is difficult to comprehend why Creditor has taken
this position. Practically speaking, Creditor must be hoping for
one of two events to occur. Creditor wants the Plan term extended
to five, rather than three, years because the longer time period
increases the likelihood either that (1) the Plan will be modified
upward; or (2) Debtor will default on the Plan and Creditor will
maintain an entitlement to the full amount of its claim. In this
Court's experience of over sixteen years on the bench, the former
is extremely rare. Accordingly, Creditor's reason for supporting
this position appears to be its hope that the Plan will fail. The
Court finds such reasoning unpersuasive. This reasoning
contravenes the Code's fresh start policy. It also delays payment
to other creditors, most of whom would likely prefer to receive
payment over three years, rather than five. Moreover, if Debtor
cannot keep up her Plan payments, she will likely convert to
chapter 7 -- which would deprive creditors of a substantial portion
of Debtor's Plan payments.

One court has held that the phrase "applicable commitment
period" does not come into play where the debtor has no disposable
income, but that, where the debtor has positive disposable income,

the phrase mandates a specific plan length.  In re Alexander, 344 B.R. 742, 751 (Bankr. E.D.N.C. 2006).  However, this is a distinction without a difference.  Construction of the phrase "applicable commitment period" as a monetary requirement renders this distinction meaningless.  The Code requires debtors to pay their projected disposable income over the applicable commitment period into the plan.  Whether that amount is zero or greater than zero makes no difference, because in the end the effect is the same.  Just as it makes no sense for a debtor to remain in chapter 13 where he has no disposable income and has paid his secured, administrative and priority claims in full, it likewise makes no sense for a debtor with some disposable income to remain in chapter 13 after he has paid the full amount required by the Code to his unsecured creditors.  In both cases, the absurdity is having a debtor remain in chapter 13 awaiting discharge where, after a certain point, he has fulfilled all of the Code requirements and his plan payment is reduced to zero.  The purpose of the Code is to provide debtors a fresh start and to ensure that creditors are paid as much as possible as soon as possible.  It is not to incentivize people to remain in bankruptcy at the continued expense of their creditors, who could have received their plan payments much earlier, and at the expense of the bankruptcy system as a whole.

Some courts adopting Creditor's position have held that the language of § 1325(b)(1)(B) "clearly indicates" that, where there is an objection to confirmation and the debtor does not propose to pay unsecured creditors in full, above-median debtors must perform a plan of reorganization for 60 months.  Cushman, 350 B.R. at 212; In re Schanuth, 342 B.R. 601, 607 (Bankr. W.D. Mo. 2006).  However,

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

the statute does not specify a minimum plan term.  The statute
merely states that, in order to be confirmed, a plan must apply all
of a debtor's projected disposable income during the applicable
commitment period to make payments under the plan.  <u>Brady</u>, --- B.R.
at ----, 2007 WL 549359 at *9.  Accordingly, the Plan meets the
requirements of the statute in that it applies all of (in fact,
much more than) Debtor's projected disposable income ($59.50)
during the applicable commitment period (60 months) to make
payments under the Plan.

The rationales supporting the conclusion that the "applicable
commitment period" is a temporal requirement are unpersuasive to
this Court.  In <u>McGuire</u>, the bankruptcy court cited three reasons
for its conclusion.  First, it reasoned that, because the
disposable income calculation on Form B22C is "merely a starting
point," and is not dispositive such that a court need not confirm a
plan that proposes to pay the amount reported on Form B22C, "it
follows that a court is not required to confirm a plan because it
proposes to pay a total sum equal to the Form B22C amount
multiplied by the applicable number of months."  <u>McGuire</u>, 342 B.R.
at 615.  This reasoning is unhelpful because, while the Court need
not reach the question of whether departure from Form B22C is
permissible under the law, under the facts of this case, the amount
of disposable income reported by Debtor on Form B22C in fact
satisfies the requirements of the Code.[9]  Therefore, the statement
that a court "is not required to confirm a plan simply because the

---

[9] If the <u>McGuire</u> decision can be read to mean that this Court
has discretion whether or not to confirm Debtor's Plan under the
circumstances, then the Court exercises its discretion to confirm
the Plan for the reasons explained in this decision.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  debtors propose a plan payment in the Form B22C amount," does not

2  help answer the question of whether a court may do so when the

3  amount of the Form B22C payment is not challenged as being too low.

4      The second reason cited by the McGuire court was that "a

5  monetary interpretation of ACP renders § 1325(b)(4)(B)

6  meaningless." Id.  That section states that the applicable

7  commitment period "may be less than 3 or 5 years, whichever is

8  applicable under subparagraph (A), but only if the plan provides

9  for payment in full of all allowed unsecured claims over a shorter

10 period."  The contention that this section is rendered superfluous

11 by a monetary interpretation of "applicable commitment period"

12 assumes that it is inherent in the Code that a debtor who pays

13 unsecured claims in full may complete a chapter 13 plan in less

14 than 36 months.  See Davis, 348 B.R. at 455: "Under this

15 interpretation of ACP, § 1325(b)(4)(B) doesn't really state

16 anything more than that a debtor does not have to pay more than

17 100% on his unsecured claims."  The fact that the Code specifically

18 provides that if a debtor pays 100% of his claims with interest

19 that the court must confirm the plan regardless of the plan's

20 length does not mean that a debtor may not do what the Debtor's

21 Plan does here, i.e., pay the same amount to unsecured creditors

22 that would be required over five years, in three years.

23 Accordingly, the Court is not persuaded by this argument.

24     The third and final rationale used by the McGuire court to

25 support its conclusion was that Congress did not express any intent

26 to alter pre-BAPCPA practice on this issue by enacting the BAPCPA.

27 McGuire, 342 B.R. at 615.  Prior to BAPCPA, § 1325(b)(1)(B)

28 required all of the debtor's projected disposable income received

1  during the three-year period, beginning on the due date of the

2  first payment, to be applied to the plan, and according to <u>McGuire</u>,

3  debtors were not allowed to exit chapter 13 early unless they could

4  establish extraordinary circumstances or creditors were paid in

5  full. <u>Id</u>. Noting that the BAPCPA amendments in this regard only

6  changed the phrase "the three year period" to "applicable

7  commitment period", the <u>McGuire</u> court, following <u>Schanuth</u>, 342 B.R.

8  at 608, discerned no clear intent on the part of Congress to alter

9  the pre-BAPCPA practice. <u>Id</u>. The Court disagrees with <u>McGuire</u>'s

10  characterization of pre-BAPCPA law, particularly as it existed in

11  this Circuit. Several pre-BAPCPA cases permitted debtors to payoff

12  the plan balance and exit chapter 13 in less than 36 months without

13  paying unsecured creditors in full. <u>Fuger</u>, 347 B.R. at 101, citing

14  <u>In re Sunahara</u>, 326 B.R. 768 (B.A.P. 9th Cir. 2005)(court may

15  approve a plan modification allowing a debtor to complete plan in

16  fewer than 36 months without paying unsecured claims in full); <u>In</u>

17  <u>re Richardson</u>, 283 B.R. 783 (Bankr. D. Kan. 2002); <u>In re Forte</u>, 341

18  B.R. 859 (Bankr. N.D. Ill. 2005); <u>In re Miller</u>, 325 B.R. 539

19  (Bankr. W.D. Pa. 2005). Accordingly, the lack of a clearly

20  expressed Congressional intent to alter pre-BAPCPA law on this

21  issue is at best an ambiguous rationale, since an interpretation of

22  "applicable commitment period" as a monetary, rather than temporal,

23  requirement is not necessarily inconsistent with pre-BAPCPA law.

24  In the Ninth Circuit where, under <u>Sunahara</u>, debtors could modify

25  their chapter 13 plans to pay off the plan balance in less than 36

26  months, this rationale actually lends additional support to

27  Debtor's position.

28      Some of the cases take a theoretical, but impractical approach

1  to this issue that divorces the language of the Code from the

2  realities of the debtor/creditor relationship.  <u>See</u> <u>e.g.</u>, <u>Slusher</u>,

3  --- B.R. at ----, 2007 WL 118009 at *8.  There can be no question

4  that in the vast majority of cases, creditors will be <u>far</u> better

5  served under the monetary, rather than the temporal, approach.

6  Creditors will be paid sooner under the monetary approach.  This is

7  of tremendous financial advantage, especially since unsecured

8  creditors normally receive no interest on their claims.  The

9  present value of payments over three years is much greater than

10 payment of the same amount of money spread out over five years.

11 Plus, the risk of plan default is lower on a shorter plan -- which

12 means the creditors are much more likely to actually get paid,

13 rather than having the debtor convert to chapter 7, in which case

14 creditors are unlikely to receive any further payments.  In sum,

15 everyone benefits under the monetary approach in the vast majority

16 of cases.  More debtors will receive fresh starts more quickly.

17 Creditors will be paid more money, more quickly, on their claims,

18 and the entire bankruptcy system will be easier to administer and

19 much more efficient.

20      This Court agrees with the <u>Fuger</u> court that "where the debtor's

21 projected disposable income is consistent with the calculations on

22 Form B22C, it makes little sense to hold the debtor hostage for 60

23 months where the debtor can satisfy the requirements of §

24 1325(b)(1)(B) in a shorter period."  <u>Fuger</u>, 347 B.R. at 101.

25 Accordingly, the Court holds that the phrase "applicable commitment

26 period" does not dictate a minimum plan term, but requires only

27 that the Debtor's projected disposable income be computed over that

28 amount of time -- at least where, as here, Debtor's Plan provides

1  for a term of at least three years.  The Court finds that the Plan

2  proposes to pay all of Debtor's projected disposable income over

3  the sixty-month applicable commitment period to unsecured

4  creditors, and therefore satisfies the requirements of §

5  1325(b)(1)(B).  Alternatively, if this Court has the discretion to

6  confirm Debtor's three-year Plan because it pays creditors what

7  they would receive -- in fact much more than what they would

8  receive -- under a five-year plan, the Court exercises its

9  discretion to do so for the reasons set forth in this Memorandum

10 Decision.  Creditor's objection on this basis is overruled.

12                              III.

13                          CONCLUSION

14     For the reasons stated herein, the Court overrules Creditor's

15 Objection to confirmation.  The Plan shall be confirmed.  Counsel

16 for Debtor is directed to submit an order conforming to this

17 Memorandum Decision after review as to form by counsel for

18 Creditor.

21 Dated:    *April 18, 2007*

23         *Arthur S. Weissbrodt*
           _____
24         ARTHUR S. WEISSBRODT
           UNITED STATES BANKRUPTCY JUDGE

Court Service List

Cathie M. Swan
794 Blossom Hill Road #1
San Jose, CA 95123

Richard T. Hilovsky, Esq.
Law Offices of Richard T. Hilovsky
960 Saratoga Ave. #112
San Jose, CA 95129

John M. O'Donnell, Esq.
Law Offices of John M. O'Donnell
915 University Avenue
Sacramento, CA 95825

Devin Derham-Burk
P.O. Box 50013
San Jose, CA 95150-0013

Eva Alexandra Delateur
Office of the Chapter 13 Trustee
P.O. Box 50013
San Jose, CA 95150

U.S. Trustee
Office of the U.S. Trustee
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004